## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEVEN SZEKERES and DENISE MILLER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **Lead Docket Number** |
| | : | |
| | : | 3:01cv2099 (MRK) |
| DENISE C. SCHAEFFER, JOYCE SZEKERES and STEPHANIE ANN DRIDI, | : | |
| | : | |
| | : | **Member Case** |
| Defendants, | : | |
| | : | |
| | : | 3:01cv2108 (MRK) |
| STEVEN SZEKERES and DENISE MILLER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| PETER HOWARD, et al, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF DECISION

These consolidated cases arise out of a long-standing and regrettably bitter dispute among family members. In both cases, Steven Szekeres and his wife, Denise Miller, have sued various family members for incidents relating to their on-going disputes. In each case, non-family members have also been caught in the cross-fire of the family feud. In the lead case, *Szekeres v. Schaeffer,* No. 3:01cv2099 (MRK) (the "Schaeffer case"), the non-family member defendant is Denise C. Schaeffer, a family violence victim advocate employed by Hartford Interval House who had been assisting Mr. Szekeres' mother, Joyce Szekeres, in connection with a domestic

violence claim involving Mr. Szekeres.  In addition to Ms. Schaeffer, plaintiffs also sued Mr.

Szekeres' mother, Joyce, and his sister, Stephanie Ann Dridi.  In the second case, *Szekeres v.*

*Howard,* No. 3:01cv2108 (MRK) (the "Howard case"), the non-family member defendants are

two Monroe police officers, Officers Peter Howard and Mark Caulfield, who responded to a

report of a dispute among Szekeres family members at a residence in Monroe that Mr. Szekeres

and Ms. Miller had leased from Mr. Szekeres' mother, Joyce.  In that second case, plaintiffs have

also sued Mr. Szekeres' sister, Ms. Dridi, and her husband, Chaker Dridi.  In each case, plaintiffs

allege that the non-family members acted under color of state law in violation of 28 U.S.C. §

1983.  Plaintiffs also assert various pendent state law claims against the non-family defendants as

well as the family defendants.  The Szekeres family is no stranger to litigation, having been

parties to other legal actions involving one another in Connecticut state court, at least one of

which is still pending.

 Defendants in both cases have filed motions for summary judgment and, in addition, the

Dridi defendants have filed a Motion for Reconsideration [doc. #58] in the Howard case in

connection with the Court's retention of pendent state claims following dismissal of

Constitutional claims against the Dridis in the Schaeffer case.[1]  The Court will address the

motions filed in the Howard case in a separate decision to be issued at a later time.  In this

decision, the Court addresses only the motions filed in the Schaeffer case: to wit, Ms. Schaeffer's

Motion for Summary Judgment [doc. # 36]; Ms. Szekeres' and Ms. Dridi's Motions to Dismiss

[doc. ## 55, 59].  For the reasons set forth below, the Court grants summary judgment to all

---

[1]The Dridis assert that, in the event the Court grants the Motion for Summary Judgment
in the lead case, the Court should decline to exercise supplemental jurisdiction over the pendent
state claims.

defendants on the plaintiffs' § 1983 claims.  The Court also declines to exercise supplemental

jurisdiction over the remaining pendent state claims.  Therefore, the Court dismisses all

remaining claims against all defendants in the lead case, *Szekeres et al v. Schaeffer, et al,*

3:01cv2099.

## I.

Unless otherwise noted, the following facts are drawn from the plaintiffs' Amended

Complaint [doc. #24], affidavits, and the parties' statements submitted pursuant to Local Rule

56.[2]  Regarding the issues on which the Court bases its decision, the Court finds that there are

no genuine issues of material fact.  Instead, the parties merely contend that different legal

conclusions and consequences flow from those undisputed facts.

Hartford Interval House ("HIH") is a private not-for-profit corporation located in the

Hartford, Connecticut area.  *See* Amended Affidavit of Jennifer Lopez in Support of Motion for

Summary Judgment ("Lopez Affidavit") [doc. #53], ¶ 3; Amended Affidavit of Denise C.

Schaeffer in Support of Motion for Summary Judgment ("Schaeffer Affidavit") [doc. #54], ¶ 3.

According to its Web site, HIH provides support services in Hartford area towns to victims of

domestic violence through counseling, advocacy, support groups, a shelter for women and

---

[2]The relevant documents include: Amended Affidavit of Jennifer Lopez in Support of
Motion for Summary Judgment [doc. #53]; Amended Affidavit of Denise C. Schaeffer in
Support of Motion for Summary Judgment [doc. #54]; Defendant Stephanie Dridi's Local Rule
56 Statement for Lead Case [doc. #57]; Defendant Stephanie Dridi's Response to Plaintiffs' Local
Rule 56 Statement in Response to Summary Judgment Motion [doc. #76]; Reply Brief By
Defendant Schaeffer in Response to Plaintiffs' 9(c) Rule 56 Statement [doc. #77]; Plaintiffs'
Supplementary Local Rule 56(a)2 Statement [doc. #79]; Defendant Schaeffer's Third Amended
Statement of Material Facts [doc. #81]; Addendum to Supplemental Exhibits to Defendants'
Motion to Dismiss [doc. #83]; Plaintiffs' Supplementary Submission Regarding Motions for
Summary Judgment in Lead Case [doc. #86]; Plaintiffs' Supplementary Local Rule 56(a)2
Statement [doc. #87]; and Plaintiffs' Supplementary Local Rule 56(a)2 Statement [doc. #88].

children and other services. *See* http://www.intervalhousect.org. HIH has three offices located

in the Hartford area. *See id.* Connecticut Coalition Against Domestic Violence, Inc.

("CCADV") is another not-for-profit corporation, and it provides family violence response

programs and services to residents throughout the State of Connecticut, not just in the Hartford

area. Lopez Affidavit, ¶ 10; *see also* Sub-Contract for Services to Victims of Family Violence

("Agreement"), [doc. #54], Exhibit A.

In 1999, CCADV contracted with the State of Connecticut's Office of Victim Services, a

state agency, to provide services to individuals who have been victims of family violence and

who have been referred for family violence services by the Support Services Division of the

Judicial Department of the State of Connecticut.[3]  CCADV, in turn, subcontracted with HIH,

which was to employ a staff of family violence victim advocates in the Hartford area who would

provide services to individuals who have been victims of crimes of family violence as defined in

section 46b-38a of the Connecticut General Statutes.[4]  The subcontract between CCADV and

---

[3]  The contract between the State and CCADV is not a part of the record of this case, but is referred to in the HIH-CCADV subcontract, which is a part of the record. *See* Amended Affidavit of Denise C. Schaeffer in Support of Motion for Summary Judgment [doc. #54], Exhibit A, at 1.

[4]The "Sub-Contract: Services To Victims of Family Violence, Domestic Violence Program: Referred By Court Support Services Division, Superior Court, State of Connecticut - July 1, 1999 - June 30, 2000 ("Agreement") provides, in pertinent part,

"This agreement ("Agreement") is between the CONNECTICUT COALITION AGAINST DOMESTIC VIOLENCE, INC. . . ., and HARTFORD INTERVAL HOUSE, INC.  Its purpose is to provide services to victims of family violence crimes in cases referred to the Sub-Contractor by Court Support Services Division of the Superior Court, Connecticut Judicial Department.  This Agreement for service is subject to the provisions of the contract between the Connecticut Coalition Against Domestic Violence, Inc. and the State of Connecticut, Office of Victim Services (OVS) executed on September 28, 1999.

HIH was for an initial term of one year (July 1, 1999 to June 30, 2000), and it required CCADV

to pay HIH not more than $126,205 for that one year period.  There is no information in the

record on whether the subcontract was renewed for future years.

---

**I.  Description of Services**
The primary goal of this Agreement is for the Sub-Contractor to employ Family Violence
Victim Advocate (FVAA) staff who will provide services to individuals who have been
referred by the Court Support Services Division of the Superior Court . . . under
Connecticut General Statute (CGS) 46b-38c.  Referred individuals shall have been a
victim of a crime of family violence as defined in CGS 46b-38a.

The services shall be rendered by individuals designated as Family Violence Advocates
who will be employees of the Sub-Contractor.

**V.      Programmatic Modifications**
The Sub-Contractor agrees to comply with program requirements or policies developed
by the Contractor.

**VI.      Covenant to Hold Harmless**
The Sub-Contractor shall indemnify the Contractor and save it harmless from and against
any and all claims, actions, damages, liability and expense, including but not limited to
attorneys' fees, in connection with all services rendered by the Sub-Contractor or its
agents and/or employees . . .

**VII.    Awards**
The Contractor shall pay the Sub-Contractor for a sum not to exceed $126,205 during the
term of this Agreement (July 1, 1999 to June 30, 2000) for providing services to victims .
. .

**X.      Right to Inspect**
Contractor or its agent shall have the right to observe the FVAA program, in the
performance of services under this Agreement upon the provision of at least forty-eight
(48) hours prior oral notice.

**XIII.  Dispute/Grievance Resolution/Termination**
Any dispute or grievance that arises during the course of this Agreement shall be resolved
to the mutual satisfaction of both parties by the Contractor's Program Oversight
Committee, Executive Director or other authorized agent and that Sub-Contractor or its
authorized agent.

To fulfill its obligations under its subcontract with CCADV, HIH employs family violence victim advocates; these individuals are employed by HIH, not the State of Connecticut, and they are paid by HIH, not the State. Moreover, HIH is paid by CCADV, not the State, for the staff and services HIH provides under its subcontract with CCADV. CCADV presumably receives some or all of the funds it uses to pay HIH from CCADV's contract with the State, though neither party provided the Court with information regarding the precise funding sources for either HIH or CCADV or even whether all of the money CCADV pays HIH under the subcontract is derived from State sources. For purposes of the current motions, the Court will assume that CCADV pays HIH for its services with funds that CCADV, in turn, receives from the State. At oral argument on the pending motions, counsel for Ms. Schaeffer represented to the Court that HIH's total revenues are not limited solely to the payments it receive from its subcontract with CCADV and that HIH also receives funds from private philanthropic sources, such as individuals and foundations. Transcript at 24. Counsel for plaintiff did not dispute that representation.

The defendant Denise Schaeffer is employed by HIH and holds the position of "Family Violence Victim Advocate." Ms. Schaeffer is paid by HIH, not the State, and despite the allegations of the Amended Complaint, the undisputed facts show that she is employed by HIH and not, at least directly or nominally, by any State agency or the State judicial branch. *See* Lopez Affidavit, ¶ 11; Schaeffer Affidavit, ¶ 11. Ms. Schaeffer provides services to victims of family violence under the terms of HIH's subcontract with CCADV. Schaeffer Affidavit, ¶ 13. Counsel for Ms. Schaeffer stated at oral argument that she performs her victim advocate duties principally in courthouses located in the Hartford area. There, he represented, Ms. Schaeffer

6

receives referrals from Support Services personnel, meets with victims, appears with them in court if that is needed, and stays in touch with her clients by using her cellphone.  Transcript at 26.

      At the time of the events that give rise to this action, Ms. Schaeffer was providing family violence services to the defendant Joyce Szekeres, though the parties have not informed the Court how Ms. Schaeffer came to be providing services to Ms. Szekeres, for what duration Ms. Schaeffer was performing these services or even precisely what services Ms. Schaeffer provided Ms. Szekeres.  However, plaintiffs attached to their Supplementary Submission Regarding Motions for Summary Judgment in Lead Case ("Plaintiffs' Supplementary Submission") [doc. #86] a portion of a transcript [Exhibit C] from a November 30, 1999 hearing in State Superior Court in *Connecticut  v. Szekeres*, during which the State appears to have sought no-contact orders for the protection of Ms. Szekeres and Ms. Dridi as a result of alleged threats and/or assaults by Mr. Szekeres.  During the course of that proceeding, Ms. Schaeffer, among others,[5] addressed the Court on Ms. Szekeres' behalf.  Ms. Schaeffer identified herself to the Court as a "Victim Advocate," and she explained why she believed the Court should issue the no-contact orders.  State Superior Court Transcript at 7.

Whether as a part of that proceeding or otherwise, on November 18, 1999, it is undisputed that Ms. Schaeffer called Ms. Szekeres in connection with providing victim related services to her under HIH's subcontract with CCADV.  Deposition of Ms. Szekeres [doc. # 88], at 23.  According to a portion of a transcript of the deposition of Ms. Szekeres submitted by

---

[5] It appears from the transcript that the State's Attorney represented the State and sought the no-contact order.  State Superior Court Transcript at 6.

plaintiffs with their Supplementary Local Rule 56(a)2 Statement, *id.*, during the telephone conversation, Ms. Schaeffer identified herself to Ms. Szekeres as a victim advocate and offered emotional support to Ms. Szekeres.  Ms. Szekeres also testified that Ms. Schaeffer told her that she "worked with the court" and offered "to help [Ms. Szekeres] through the court process." Joyce Szekeres deposition at 23.  Ms. Szekeres said that she expressed her concerns to Ms. Schaeffer and told her that she was fearful about handguns, including a magnum .357, that Mr. Szekeres purportedly owned and also about the possibility that he would hurt himself with the weapon.  According to Ms. Szekeres's testimony, which plaintiffs have not disputed, Ms. Szekeres then asked Ms. Schaeffer "to do something about that," and Ms. Schaeffer responded that "she would be in touch with the detectives in Monroe and that they would remove the guns from the house."  *Id.* at 24.

 On the same day, Ms. Schaeffer telephoned the Monroe Police Department and spoke with Detective Bernard M. Halapin.  The location from which Ms. Schaeffer made the telephone call in question is not clear from the record, but the Court will assume that she made the call on her own cell phone from the West Hartford courthouse, as counsel for Ms. Schaeffer intimated at oral argument.  Transcript at 27.  Ms. Schaeffer stated in her affidavit that she called the Monroe police as a part of the duties she performed for HIH under its subcontract with CCADV, and plaintiffs have not submitted any evidence to the contrary.  Schaeffer Affidavit, ¶ 17.

According to a search warrant affidavit executed by Detective Halapin and Lieutenant Michael R. Flick, which is attached as Exhibit A to Plaintiff's Supplementary Submission [doc. # 86], Ms. Schaeffer identified herself to Detective Halapin as "a Victims Advocate for the West Hartford Court."  Halapin and Flick Affidavit at 2.  Detective Halapin stated that Ms. Schaeffer

informed him that Mr. Szekeres had been arrested on a warrant charging him with assaulting his 60-year old mother; that as a condition of his release he was not to possess any weapon without further notice from the court; and that while in court on November 15, 1999, Mr. Szekeres had turned over to the court a receipt indicating that he had relinquished to the Monroe Police a pellet pistol and three BB/pellet rifles. *Id.* at 2. As is particularly relevant here, according to Detective Halapin, Ms. Schaeffer also told him:

> Szekeres was a "Paranoid Schizophrenic and that his mother and sister both state that he owns a .357 magnum handgun and threatened them with it in the past. Ms. Schaeffer went on to say that she was attempting to protect Szekeres's family and feels action should be taken to locate the weapon that he did not turn over to police.

*Id.* at 3a.

According to the affidavit, after speaking with Ms. Schaeffer, Detective Halapin contacted Mr. Szekeres, who denied that he had a .357 magnum handgun or that one existed in his home. However, he refused to grant permission to allow the police to search his residence. *Id.* Detective Halapin also telephoned Ms. Szekeres, who stated that she had seen the .357 magnum handgun about three years ago, which was also when Mr. Szekeres supposedly put the gun to his head while it was unloaded. *Id.*

After making the telephone calls described above, Detective Halapin and Lieutenant Flick applied for a warrant to search Mr. Szekeres' home pursuant to Conn. Gen. Stat. § 29-38c(a). Section 29-38c(a) authorizes a Superior Court judge to issue a search warrant if two police officers, after having "conducted an independent investigation," determine that probable cause exists to believe that: (1) a person poses a risk of imminent personal injury to himself or herself or other individuals; (2) the person possesses one or more firearms; and (3) the firearm or

firearms are within or upon any place, thing or person.  *See* Conn. Gen. Stat. § 29-38c(a).[6]  The

affidavit that Detective Halapin and Lieutenant Flick submitted in connection with the warrant

application recited the facts set forth above and concluded as follows: "Based upon the facts

reported by Victim's Advocate Denise C. Schaeffer, the affiants are respectfully requesting

authorization to search the residence [of Mr. Szekeres] to locate and seize all firearms."  The

affidavit and warrant application were presented to Superior Court Judge George Thim, who

issued the search warrant on the same day, November 18, 1999.

     Monroe police executed the warrant, but the search of Mr. Szekeres' residence yielded no

gun or weapon.  Plaintiffs have also submitted to the Court a "To Whom It May Concern" letter

from a Dr. Jay Berkowitz, M.D., Supervisor of Mental Health for the Community Correctional

Center of Bridgeport, which stated that Dr. Berkowitz evaluated Mr. Szekeres on October 23,

2000 and found Mr. Szekeres to be "mentally stable" and "mentally sound," "with no evidence of

psychosis, depression or any mental illness."  Plaintiff's Supplementary Submission Regarding

Motion for Summary Judgment, [doc. #86], Exhibit B.

     This lawsuit was filed on November 1, 2001.  In their Amended Complaint, plaintiffs

allege that the statements by Ms. Schaeffer and Ms. Szekeres that Mr. Szekeres possessed a .357

magnum handgun, that he had put the gun to his head and that he was a "Paranoid

Schizophrenic" were all false and malicious.  For purposes of this motion, the Court assumes that

---

[6]  Section 29-38c(a) also provides in pertinent part as follows:

A warrant shall not be issued unless "such police officers have conducted an independent investigation and have determined that such probable cause exists and that there is no reasonable alternative available to prevent such person from causing imminent personal injury to himself or herself or to others with such firearm."

the information Ms. Schaeffer supplied the police was false.

Plaintiffs also allege in the Amended Complaint that at all times, Ms. Schaeffer was a "Connecticut Victims Advocate acting within the scope of her authority as an officer of the Executive Branch of the State of Connecticut pursuant to the provisions of Sections 446-a-13b, 46a-13c and 46-a-13d of the Connecticut General Statutes and/or as an officer of the Judicial Branch of the State of Connecticut pursuant to the provisions of Section 46-b-38c of the Connecticut General Statutes." Amended Complaint [doc. # 24], ¶ 4. "As such," the Amended Complaint alleges, Ms. Schaeffer "was empowered by Section 46a-13d of the Connecticut General Statutes to compel all state, local and private agencies to 'cooperate' with her in the performance of her duties." *Id.* Plaintiffs allege in their Amended Complaint that Ms. Szekeres and Ms. Dridi "were private citizens acting jointly and in concert with defendant Schaeffer." *Id.* ¶ 5. Accordingly, plaintiffs assert that at all times, the defendants were "acting under color of Section 46a-13b through 46a-13d of the Connecticut General Statutes and of the constitution, laws, rules, regulations, customs and usages of the State of Connecticut." *Id.* ¶ 6. Plaintiffs sued all defendants under 42 U.S.C. § 1983 for violation of their Fourth Amendment right to be free from unreasonable searches and seizures and also asserted pendent state law claims against all defendants for slander, intentional infliction of emotional distress and negligent infliction of emotional distress.

All of the defendants have now filed motions for summary judgment. After holding argument on the summary judgment motions, the Court gave each party the right to submit

additional evidence and briefing in support of their positions, and all parties did so.[7]

## II.

The Court applies the familiar standards for considering a summary judgment motion. Briefly stated, summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(b). A genuine issue of fact exists when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome if the substantive law renders them so. *Andersen v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, the party opposing summary judgment "may not rest upon mere allegations or denials," rather the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P 56(e). The Court has drawn all ambiguities and inferences in favor of the plaintiffs. *See Andersen*, 477 U.S. at 255. However, to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Andersen,* 477 U.S. at 249-50.

---

[7]These supplemental documents consist of: Defendant Schaeffer's Third Amended Statement of Material Facts [doc. #81]; Addendum to Supplemental Exhibits to Defendants' Motion to Dismiss [doc. #83]; Plaintiffs' Supplementary Submission Regarding Motions for Summary Judgment in Lead Case [doc. #86]; Plaintiffs' Supplementary Local Rule 56(a)2 Statement [doc. #87]; and Plaintiffs' Supplementary Local Rule 56(a)2 Statement [doc. #88].

III.

"To state a claim for relief in an action brought under § 1983, [plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). Courts have consistently treated the "under color of state law" element of § 1983 "as the same thing as the 'state action' required under the Fourteenth Amendment." *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (quoting *United States v. Price*, 383 U.S. 794 (1966)); *see United States v. Int'l Bhd. of Teamsters*, 941 F.2d 1292, 1295 (2d Cir. 1991) ("Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action'"). "State action requires both an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' *and* that 'the party charged with the deprivation must be a person who may fairly said to be a state actor.'" *Sullivan*, 526 U.S. at 50 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)) (emphasis in original). Careful attention to the state action requirement serves two purposes: it "preserves an area of individual freedom by limiting the reach of federal law and federal judicial power," *Lugar*, 457 U.S. at 936; and it avoids imposing on a state responsibility for conduct that it could not control. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).

As a consequence, the threshold issue on plaintiffs' § 1983 claims is whether defendants were acting under color of state law when they made the allegedly false statements to police that

led to issuance of the search warrant.  Plaintiffs readily acknowledge that Ms. Szekeres and Ms.

Dridi are private individuals.  However, plaintiffs claim that Ms. Szekeres and Ms. Dridi were

acting in concert with Ms. Schaeffer and plaintiffs further assert that Ms. Schaeffer was acting

under color of state law when she telephoned Detective Halapin, gave him the false information

and asked him to take action to locate Mr. Szekeres' alleged .357 handgun. (Amended Complaint,

¶ 5).  Plaintiffs' § 1983 claim against all defendants, therefore, rises or falls on whether plaintiffs

can establish that Ms. Schaeffer was a state actor when she called the police.

A.

In the Amended Complaint, plaintiffs assert that  Ms. Schaeffer was a "Connecticut

Victims Advocate" acting as an officer of the Executive Branch under Conn. Gen. Stat. § 46a-

13b-d or an officer of the Judicial Branch under Conn. Gen. Stat. § 46b-38c.  The Office of the

Victim Advocate was established pursuant to Conn. Gen. Stat. § 46a-13b and provides for the

appointment of a Victim Advocate by the Governor.  The Victim Advocate serves a four-year

term, and must be both an attorney and qualified to assume the responsibilities of the Victim

Advocate.  The Victim Advocate has funds available to hire staff, who may assume the duties of

the Victim Advocate under the supervision of the Victim Advocate.  *See* Conn. Gen. Stat. § 46a-

13b(a).  Under § 46a-13c, the Victim Advocate may, in pertinent part,

> (1)     Evaluate the delivery of services to victims by state agencies and those entities
> that provide services to victims, including the delivery of services to families of
> victims by the Office of the Chief Medical Examiner;
>
> (2)     Coordinate and cooperate with other private and public agencies concerned with
> the implementation, monitoring and enforcement of the constitutional rights of
> victims and enter into cooperative agreements with public or private agencies for
> the furtherance of constitutional rights of victims;

14

     (4)     Receive and review complaints of persons concerning the actions of any state or other entity providing services to victims and investigate those where it appears that a victim or family of a victim may be in need of assistance from the Victim Advocate;

     (5)     File a limited special appearance in any court proceeding for the purpose of advocating for any right guaranteed to a crime victim by the Constitution of the state or any right provided to a crime victim by any provision of the general statutes;

     (6)     Ensure a centralized location for victim services information.

Conn. Gen. Stat. § 46a-13c.  In carrying out the foregoing powers and duties, the Victim Advocate can compel "all state, local and private agencies to cooperate with any investigation conducted by the Office of the Victim Advocate."  Conn. Gen. Stat. § 46a-13d(a).

Based on the affidavit of Ms. Schaeffer and her supervisor, Ms. Lopez, it is clear that Ms. Schaeffer is not Connecticut's Victim Advocate, as the Amended Complaint suggests; nor is she an employee of the Office of the Victim Advocate or an employee of the Executive or Judicial Branches of state government, as the Amended Complaint alleges.  Instead, the undisputed facts show that Ms. Schaeffer is employed by HIH, a private not-for-profit corporation.  However, the fact that the allegations of the Amended Complaint are erroneous and that Ms. Schaeffer is an employee of a private corporation does not necessarily end the matter because the Supreme Court and the Second Circuit have held that under certain circumstances even private individuals or entities can been deemed to be state actors for purposes of § 1983.

When analyzing allegations of state action, both the Supreme Court and Second Circuit have instructed courts to begin "'by identifying the specific conduct of which the plaintiff complains.'"  *Tancredi v. Metropolitan Life Ins. Co.*, 316 F.3d 308, 313 (2d Cir. 2003) (quoting *Sullivan*, 526 U.S. at 51).  When, as here, the defendant is a private entity or individual, in order

to satisfy the state action requirement, the allegedly unconstitutional conduct must be "fairly attributable" to the State. *Sullivan*, 526 U.S. at 50. The Second Circuit recently observed that "[c]onduct that is ostensibly private can be fairly attributable to the state only if there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Tancredi*, 316 F.3d at 313 (internal quotations omitted); *see Brentwood*, 531 U.S. at 295. State action may properly be found:

> where the State exercises "coercive power" over, is "entwined in [the] management or control" of, or provides "significant encouragement, either overt or covert" to, a private actor, or where the private actor "operates as a wilful participant in joint activity with the State or its agents," is "controlled by an agency of the State," has been delegated a "public function" by the state, or is "entwined with governmental policies."

*Tancredi*, 316 F.3d at 313 (quoting *Brentwood*, 531 U.S. at 296); *see also Lugar*, 457 U.S. at 941. In deciding whether a particular action or course of action is governmental in character, it is relevant to examine the extent to which the actor relies on governmental assistance and benefits; whether the actor is performing a traditional governmental function; and whether the injury caused is aggravated in a unique way by the incidents of governmental authority. *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 621 (1991).

Here, the conduct that is alleged to have violated Mr. Szekeres' constitutional rights is Ms. Schaeffer's allegedly false statements to Detective Halapin about Mr. Szekeres and her request that he take some action regarding Mr. Szekeres' purported .357 handgun. This is not a case, therefore, where a *victim* of domestic violence complains of unconstitutional conduct by a victim's advocate assigned by the State to care for and provide services to the victim. *Cf. West v. Atkins*, 487 U.S. 42, 55-56 (1988) (when state delegates its constitutional duty to provide medical

16

care to prison inmates to private physician, physician acts under color of law in providing medical care to inmates).  Instead, Mr. Szekeres, a third party, complains that while providing assistance to Ms. Szekeres, a victim of domestic violence, Ms. Schaeffer made statements to the police that Mr. Szekeres alleges violated *his* constitutional right to be free from unreasonable searches and seizures.

Plaintiffs advance four theories upon which they assert the existence of a close enough nexus between Ms. Schaeffer's conduct and the State that her actions are "fairly attributable" to the State: (1) that HIH and its employees were an instrumentality of the State, or, stated differently, that the State was sufficiently entwined in the management or operation of HIH that it is fair to treat HIH and the State as one; (2) that the State compelled the conduct of Ms. Schaeffer which is at issue in this case; (3) that the State significantly encouraged the activities of Ms. Schaeffer which allegedly resulted in the violation of plaintiffs' constitutional rights; and (4) that public funding combined with Ms. Schaeffer's performance of an exclusively public function was sufficient to render her a state actor and treat her actions as those of the State.  The Court concludes that plaintiffs' theories are either unsupported by the factual record, unsupported by relevant case law, or both.

First, HIH is not an instrumentality of the State.  It is undisputed that HIH is a private not-for-profit corporation that is paid by CCADV, another private non-profit corporation, for the services that Ms. Schaeffer was providing Ms. Szekeres.  Plaintiffs have submitted no evidence that would suggest that the State is entwined in HIH's management or that it provides any direct funding for HIH's activities.  It may be true that HIH was paid by CCADV with funds that

CCADV received through its contract with the State Victim Advocate's office,[8] but the public

funds HIH received were at best *indirect* and resulted from a subcontract between two private

entities.  "[A]cts of . . . private contractors do not become acts of the government by reason of

their significant or even total engagement in performing public contracts."  *Rendell-Baker*, 457

U.S. at 841.  Moreover, even assuming that the funds HIH received from CCADV are properly

characterized as "state funds," the Supreme Court has repeatedly made clear that government

funding of a private entity, no matter how extensive, is insufficient in and of itself to establish

state action.  *See Rendell-Baker*, 457 U.S. at 840 (a private school receiving 90% of its operating

budget from public funds was not deemed a state actor); *see also Blum v. Yaretsky*, 457 U.S. 991,

1011 (no state action even though state paid the medical expenses of more than 90% of the

patients and subsidized the operating and capital costs of the nursing homes).

Plaintiffs have not come forward with any facts, as it is required to do in order to succeed

under its first theory, that would show substantial control by the State over HIH's management

generally or in the performance of its duties under its subcontract with CCADV.  *See, e.g.,*

*Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir. 2000) (affirming dismissal of § 1983 claim

against Legal Aid Society because of "'lack of governmental control over or interference with'

legal aid societies' affairs 'notwithstanding the receipt of substantial government funds' by the

societies") (quoting *Graseck v. Mauceri*, 582 F.2d 203, 208 (2d Cir. 1978)).  In arguing that HIH,

and hence its employees, should be treated as an instrumentality of the State, plaintiffs rely on

*Lebron v. National RR Passenger Corp.*, 513 U.S. 374 (1995).  But in *Lebron*, the Supreme

---

[8]The Agreement states that "[p]ayments due Sub-Contractor from the Contractor are contingent upon Contractor's receipt of sums due Contractor under the contract or subsequent amendments with the Office of Victim Services." Agreement at 7.

18

Court declared Amtrak a governmental actor despite its designation by statute as a private entity on the grounds that "Amtrak was created by a special statute, explicitly for the furtherance of federal governmental goals . . . [I]t is established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees." *Id.* at 397-98.  In contrast to Amtrak, HIH was not "created" by state law to achieve state objectives.[9]  Nor have plaintiffs presented any evidence that would suggest that the State exercises any control over HIH such that its actions are fairly attributable to the State.  *See Schnabel*, 232 F.3d at 87.[10]

For similar reasons, this case also differs from the Tennessee Secondary School Athletic Association involved in *Brentwood*, *supra,* another decision cited by plaintiffs.  There, the Athletic Association's "nominally private character [was] . . . overborne by the pervasive entwinement of public institutions and public officials in its composition and workings . . ." *Brentwood*, 531 U.S. at 298.  Public school officials in *Brentwood* comprised 86% of the Athletic Association, and they did not "merely control but overwhelmingly perform[ed] all but the purely ministerial acts by which the Association exists and functions in practical terms." *Id.* at 300.  Plaintiffs have not submitted any facts that would permit a trier of fact to conclude that

---

[9]  Moreover, it is insufficient standing alone to declare an entity a state actor on the basis that the government created the entity to further a stated governmental objective.  *See Hack v. President and Fellows of Yale College*, 237 F.3d 81, 84 (2d Cir. 2000) (finding that although the State of Connecticut created Yale College by special law for a governmental objective, the State's reservation to appoint two of the nineteen board members was "a long way from control.").

[10]  Plaintiffs also cite *Malesko v. Correctional Serv. Corp.*, 229 F.3d 374 (2d Cir. 2000), but inexplicably fail to note that the decision was reversed by the Supreme Court, *Correctional Serv. Corp. v. Malesko*, 534 U.S. 61 (2001).  Brief in Opposition to Motion for Summary Judgment of Defendant Schaeffer [doc. #61], at 6.

the State dominated HIH or otherwise controlled the composition of this private not-for-profit corporation or its workings.

Second, plaintiffs also have not submitted any evidence that proves, or even suggests through reasonable inference, that the State compelled Ms. Schaeffer's actions in purportedly giving false information to the Monroe police and requesting the police to obtain a search warrant for Mr. Szekeres' home.  Indeed, the evidence submitted is to the contrary.  In their affidavits, Ms. Schaeffer and her supervisor, Ms. Lopez, state that none of the provisions of the Connecticut General Statutes cited in the Amended Complaint apply to HIH and that when she called the Monroe police and relayed Ms. Szekeres' concerns, Ms. Schaeffer was performing her duties as a victim advocate for HIH in connection with HIH's subcontract with CCADV. Schaeffer Affidavit, ¶ 13; Lopez Affidavit, ¶ 13.  That subcontract generally describes the nature of HIH's responsibilities and the duties of victim advocates, but it does not do so in great detail and it says nothing about reporting claims of the victim to the police or indeed how or when a victim advocate should contact the police or seek a search warrant.  Notably as well, all of the duties of HIH under the subcontract run explicitly to CCADV, not to the State or the Judicial Department. Agreement, at 6.  For example, HIH agrees to comply with policies developed by CCADV; there is no similar provision regarding state policies.[11]  HIH also agrees to indemnify CCADV, not the State, for the conduct of HIH employees.  *Id.* at 7.  While the State might well

_____

[11]   Plaintiffs have not submitted any of the policies developed by CCADV, and therefore, there is nothing in the record from which one could conclude that Ms. Schaeffer was following CCADV policies, let alone the State's, when she called the Monroe police.  Indeed, both Ms. Schaeffer and Ms. Lopez state, without dispute, in their affidavits that Ms. Schaeffer was following HIH's policies in connection with the services she rendered to Ms. Szekeres.  Schaeffer Affidavit, ¶ 13; Lopez Affidavit, ¶ 13.

be considered to be a third-party beneficiary of HIH's obligations to CCADV, plaintiffs cite no decision holding that a State's third-party beneficiary status under a contract between private entities is sufficient to transform private conduct into state action.

To be sure, one can certainly imagine a situation in which a State hires a private individual to perform services that the State is obligated to perform, trains the individual, actively controls the performance of the individual's duties, cloaks the individual with state authority, monitors the individual's performance and substantially dictates the conduct that is the subject of the § 1983 action. *See Focus on the Family v. Pinellas Suncoast Transit Autho.*, 344 F.3d 1263, 1278 (11th Cir. 2003) (the State contractually required private entity to take the particular actions that allegedly caused harm). However, that is not remotely what the record in this case discloses. The affidavits of Ms. Schaeffer and Ms. Lopez state that Ms. Schaeffer was providing services to Ms. Szekeres pursuant to the HIH-CCADV sub-contract, not pursuant to any State directive, statute or obligation, and the subcontract between HIH and CCADV does not even hint at control by the State over the manner in which Ms. Schaeffer provided services to Ms. Szekeres. *See Atkinson v. B.C.C. Assocs.*, 829 F.Supp. 637 (S.D.N.Y. 1993) (private employer under contract to bridge and tunnel authority did not act under color of state law because no evidence that the authority played any role in the conduct that is subject of § 1983 action). In fact, plaintiffs have submitted no evidence whatsoever of any state control or involvement in this matter other than the fact that the Support Services Division apparently referred Ms. Szekeres to Ms. Schaeffer for the provision of appropriate services.[12]  Since the State's reference of Ms. Szekeres to Ms.

---

[12]  Section 46b-38c(f) of the Connecticut General Statutes states, in pertinent part, that "[i]n cases referred to the local family violence intervention unit, it shall be the function of the unit to (1) identify victim services needs and, *by contract with victim service providers, make*

Schaeffer is not the conduct at issue in this case, however, that fact is irrelevant. *See Rendell-Baker*, 457 U.S. at 841; *Blum*, 457 U.S. at 1008; *Flagg Bros.*, 436 U.S. at 164-66; *Intl. Bhd.*, 941 F.2d at 1296. Moreover, "'[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action.'" *Tancredi*, 316 F.3d at 313 (quoting *Sullivan*, 526 U.S. at 52); *see also Flagg Bros.*, 436 U.S. at 164.

Third, plaintiffs have also not established that the State so significantly encouraged the conduct of Ms. Schaeffer in contacting the police that her acts should be attributed to the State. Plaintiffs allege that Ms. Schaeffer is authorized by Conn. Gen. Stat. § 46a-13d(a) to compel "all state, local and private agencies to 'cooperate' with her in the performance of her duties." Amended Complaint, ¶ 4. However, there is no basis for these allegations since, by its terms, this statutory section applies to the Connecticut Victim Advocate, not to the private contractors of CCADV, a fact also confirmed by the affidavits of Ms. Schaeffer and Ms. Lopez and not contradicted by plaintiffs.

Plaintiffs also argue that the evidence shows that Ms. Schaeffer did in fact compel Detective Halapin to seek a search warrant that he otherwise did not want to obtain. Transcript, 21-22; Deposition of Joyce Szekeres, 25-26. However, there is no competent evidence to support that assertion.[13] More importantly, even if the Court assumes that Detective Halapin felt

_____

*available appropriate services* . . . Conn. Gen. Stat. § 46b-38c(f) (emphasis added).

[13] To support this claim plaintiffs rely on two items in the record, neither of which provide the evidentiary support plaintiffs seek. The first is a deposition transcript in which Ms. Szekeres testified that when Detective Halapin called her, he was "annoyed and angry with me that somehow Denise Schaeffer had this influence over the Monroe Police Department and he did not want to go out and search the house." Deposition of Joyce Szekeres at 26. Second, plaintiffs cite Detective Halapin's affidavit, in which he concludes that "Based upon the facts reported by Victim's Advocate Denise C. Schaeffer, the affiants are respectfully requesting" a

compelled or even pressured by Ms. Schaeffer to ask Judge Thim for a warrant, that fact would

not permit the Court to conclude that Ms. Schaeffer's false statements to the police are fairly

attributable to the State.  *See Tancredi*, 316 F.3d at 313.  Similarly, the fact that, according to

plaintiffs, Ms. Schaeffer misrepresented herself  "as a court official, to wit: Victim Advocate,"

Plaintiffs' Supplementary Local Rule 56(a)2 Statement, at § B(1) [doc. #88], even if true, would

not transform Ms. Schaeffer into a state actor absent some indication that the State exercised

coercive power over her or provided significant encouragement, either overt or covert, for her

actions, neither of which plaintiffs has shown.  *See Sullivan*, 526 U.S. at 52; *Tancredi,* 316 F.3d

at 313.

Plaintiffs argue that because Ms. Schaeffer performs her duties in state courthouses, she

was acting with significant encouragement, either overt or covert from the State.  However,

"[m]ere approval of or acquiescence in the initiatives of a private entity is not sufficient to justify

holding the State responsible for those initiatives . . ."  *Blum*, 457 U.S. at 1004; *see also Flagg*

*Bros.,* 436 U.S. at 164.  As the Supreme Court's decisions show, "the crucial relationship for a

finding of state action is between the governmental entity and the *action* taken by the private

---

warrant.  Affidavit of Halapin and Flynn, at 3a..

Ms. Szekeres's testimony about what Detective Halapin told her is clearly inadmissible
hearsay.  At oral argument, plaintiffs' counsel claimed the statement was admissible as an
"excited utterance," but there is no basis in the record or relevant caselaw for such a conclusion.
*See* Fed. R. Evid. 803(2); *see also  United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002); *see
also* 5 J. Weinstein & M. Berger, WEINSTEIN'S FEDERAL EVIDENCE ¶ 803.04[1] - [2] (2d ed.,
2003).  Furthermore, under state law, both detectives had a statutory duty to make an
"independent investigation" and determination of probable case.  *See* Conn. Gen. Stat. § 29-
38c(a)**,** and plaintiffs have not provided any evidence from which one could conclude that the
officers did anything other than discharge their statutory duties.  In the end, of course, the search
warrant was issued by Judge Thim after he made a determination based on the affidavits
submitted by the Monroe police that probable cause existed for issuance of the warrant.

entity, not between the governmental entity and the private *actor*." *Young,* 152 F. Supp. 2d at 364. While the fact that Ms. Schaeffer was permitted to or even expected to assist family violence victims principally at or around the courthouse "might speak to the latter, in the absence of some indication of how [the State] shaped or compelled the challenged conduct, [it] simply do[es] not speak to the former in any meaningful way." *Id.*

At argument, plaintiffs asserted that it is Ms. Schaeffer's burden to prove that her actions are *not* attributable to the State. Transcript at 8 and 11. Plaintiffs have it backwards. "Where one starts with an admittedly private institution the question is not what tests show its action are not attributable to the state, but, rather, what shows they are attributable." *Johnson v. Pinkerton Academy*, 861 F.2d 335, 337 (1st Cir. 1988). It is, therefore, plaintiffs' burden to establish that the State played a role in substantially encouraging, if not dictating, the conduct of Ms. Schaeffer that is the focus of plaintiffs' § 1983 claim. *See Blum*, 457 U.S. at 1004 (plaintiff has the burden of showing "the State is *responsible* for the specific conduct of which the plaintiff complaints") (emphasis in original); *see also Young*, 152 F. Supp. 2d at 364; *Atkinson*, 829 F. Supp. at 645. That is a burden plaintiffs have not satisfied.

Finally, the Court rejects plaintiffs' public function argument. The public function theory applies only to the "exercise by a private entity of powers traditionally exclusively reserved to the state." *Jackson  v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974). However, "[t]he fact that a private entity performs a function which serves the public does not make its acts [government] action." *Sullivan*, 526 U.S. at 56 (quoting *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 544 (1987)) (internal citation omitted). The relevant question is not simply whether a private group is serving a "public function" but rather "whether the function

24

performed has been 'traditionally the *exclusive* prerogative of the State.'" *Rendell-Baker*, 457

U.S. at 842 (quoting *Jackson*, 419 U.S. at 353).  Expressed another way, to constitute state action

under the public function doctrine, private conduct must not only be something the government

traditionally does, but it also must be something that *only* the government traditionally does.

There are no facts to support plaintiffs' allegation that victim support services are the

exclusive or even traditional prerogative of the State, and merely asserting as much does not

present a triable issue.  CCADV itself was founded in 1978 and is an umbrella group for 18

programs operating throughout the State that provide services to victims of domestic abuse,

many of which are funded at least in part by private donations.  *See*

http://www.ctcadv.org/Website/index.htm. The statute establishing the Office of the Victim

Advocate was passed only in 1998, Conn. Gen. Stat. § 46a-13b, and there is no evidence in the

record showing that the State had historically provided services to victims of domestic violence.[14]

Finally and most importantly, plaintiffs do not provide facts to support the view that

assistance to victims of domestic violence has traditionally been provided *exclusively* by the

government.  *See Andrews v. Fed. Home Loan Bank of Atlanta,* 998 F.2d 214, 219 (4th Cir.

1993) (bank examinations and auditing not functions exclusively performed by government);

*Gerena v. Puerto Rico Legal Serv., Inc.,* 697 F.2d 447, 451 (1st Cir. 1983) (legal services

corporation not a state actor because providing assistance in civil actions to those unable to pay

---

[14]On the contrary, the Senate and House proceedings on the bill establishing the Office of the Victim Advocate suggest that the services to be provided by the Office to victims of crimes was not only a novel undertaking by the State of Connecticut, but that the bill itself was initiated by a coalition of private advocacy groups, including Mothers Against Drunk Driving, Connecticut Conference Against Domestic Violence, Connecticut Sexual Assault Crisis Services, and Survivors of Homicide. *See* S. 449, PA 98-321, Reg. Sess., at 229-30 (Conn. 1998); *see also* H. 449, PA 98-231, Reg. Sess., at 341, 345, and 350 (Conn. 1998).

has never been a traditionally exclusive function of the government); *Henderson v. Center for Cmty. Alternatives*, 911 F. Supp. 689, 709 (S.D.N.Y. 1996) (providing advocacy services to juvenile offenders is not "exclusive province of the state").  To the contrary, providing comfort, sympathy and assistance to those who find themselves in court, including victims of family violence or domestic abuse, are services that traditionally have been provided by private non-profit groups.

The Court emphasizes that it does not hold that the conduct of private victim advocates such as Ms. Schaeffer can never constitute state action.  Instead, the Court merely holds that in this particular case, plaintiffs have simply failed to carry their burden of showing that the conduct of Ms. Schaeffer that forms the basis of their lawsuit is "fairly attributable" to the State.  *See Blum*, 457 U.S. at 1004; *see also Atkinson*, 829 F. Supp. at 645.  In short, plaintiffs have failed to show that the alleged constitutional deprivation was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,"as required for a § 1983 action.  *Sullivan*, 526 U.S. at 50.

## B.

Because plaintiffs have failed to establish the threshold requirement for a claim under 42 U.S.C. § 1983 – that Ms. Schaeffer acted under color of state law – the Court will grant Ms. Schaeffer judgment on plaintiffs' 1983 claim.[15]  Plaintiffs acknowledged at oral argument and

---

[15]  In view of the Court's ruling, there is no need to address Ms. Schaeffer's alternative argument that plaintiffs cannot establish that Ms. Schaeffer violated their constitutional rights (Memorandum of Law in Support of Motion for Summary Judgment [doc. #51], at 7) or the alternative arguments of Ms. Dridi that plaintiffs cannot establish that she or Ms. Szekeres acted in concert with Ms. Schaeffer.  Memorandum of Law in Support of Motion for Summary Judgment in Lead Case [doc. #56], at 7.

in their briefs that their § 1983 claims against Ms. Szekeres and Ms. Dridi – both of whom

plaintiffs acknowledge are private citizens – were dependent on whether plaintiffs could establish

that Ms. Schaeffer acted under color of state law.  Since the Court has concluded that Ms.

Schaeffer is entitled to judgment on plaintiffs' § 1983 claim, so, too, are Ms. Szekeres and Ms.

Dridi entitled to judgment on plaintiffs' § 1983 claim.

IV.

Plaintiffs' remaining claims against all defendants – for slander and intentional and

negligent infliction of emotional harm –  are exclusively state law claims.  Since the parties are

not completely diverse, plaintiffs have sought to ground this Court's jurisdiction over those state

law claims on the basis of the presence of their federal § 1983 claim and the supplemental

jurisdiction statute, 28 U.S.C. § 1367.  Defendants argue that if this Court grants judgment on

plaintiffs' § 1983 claim, the Court should decline to exercise supplemental jurisdiction over the

state law claims and should remit the parties to state court to pursue those claims.  Defendants

point out that plaintiffs currently have pending at least one state court action involving both Ms.

Szekeres and Ms. Dridi.  *See Szekeres v. Szekeres*, Docket No. 1006022, attached to doc. # 83.

"In exercising its discretion with respect to retaining supplemental jurisdiction, the

district court balances several factors 'including considerations of judicial economy, convenience,

and fairness to litigants.'"  *Correspondent Serv. Corp. v. First Equities Corp. of Florida*, 338

F.3d 119, 126 (2d Cir. 2003) (quoting *Purgess v. Sharrock, M.D.*, 33 F.3d 134, 138 (2d Cir.

1994).  Defendants argue that because this case has been pending for some time in federal court,

the Court should continue to exercise jurisdiction over the dispute and should dispose of the

parties' state law claims as well.  It is true that the case has been pending for some time, but

27

plaintiffs have also been well aware from the outset of these consolidated cases that defendants did not believe that plaintiffs could establish the state action needed to support the § 1983 claim and that, therefore, their state claims were at risk of being dismissed.  *See* Ruling on Motion to Dismiss [doc. # 33].  In that regard as well, the Court would note that plaintiffs could have avoided the supplemental jurisdiction issue entirely by filing both their state law claims and § 1983 claim in state court in the first instance.  *See Felder v. Casey*, 487 U.S. 131, 147 (1988) (holding that federal and state courts have concurrent jurisdiction over § 1983 claims).

After careful consideration of the relevant factors and the equities, the Court concludes that it is not in the interests of fairness, justice or economy for the Court to continue to exercise supplemental jurisdiction over plaintiffs' state law claims.  *See, e.g., K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 130-31 (2d Cir. 1995) (upholding district court's dismissal of state law claims upon granting summary judgment in defendants' favor where, as in this case, jurisdiction over state law claims were premised solely on supplemental jurisdiction under § 1367 due to absence of complete diversity between the parties.).[16]  In reaching that conclusion, the Court has considered, among other factors, the following: the parties have previously pursued litigation in state court involving one another and therefore litigating disputes in state court is neither burdensome nor unfamiliar to plaintiffs; the family parties already have at least one case still pending in Bridgeport Superior Court that involves related aspects of their ongoing disputes and therefore there may be economies to be achieved by combining their disputes in one state court action; plaintiffs have been on notice since the outset of this case that there was a risk that

---

[16]Section 1367 states that a district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. §1367(c)(3).

their state law claims would be dismissed if judgment was granted on their federal law claims; the gravamen of plaintiffs' cause of action has always fundamentally sounded in state law issues and the § 1983 claim appeared to be the federal claim "tail" wagging a state claim "dog"; the remaining issues would require this Court to construe state law and all involve conduct that, if actionable at all, involves issues in which state courts have a greater interest and familiarity than federal courts; and the parties will in any event be able to use in state court the discovery they have already conducted in this case, thereby avoiding duplication and conserving resources. Accordingly, the Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims and dismisses the remaining claims against all defendants without prejudice to their renewal in state court.

V.

Defendants' Schaeffer, Dridi and Szekeres' Motions for Summary Judgment [doc. ## 36, 55 and 59, respectively], are GRANTED. The Court declines to exercise supplemental jurisdiction over the remaining Connecticut state law claims on the ground that the Court has dismissed all federal law claims. The Clerk is ordered to close the lead case in this matter, Szekeres v. Schaeffer, 3:01cv2099.

IT IS SO ORDERED.

/s/      Mark R. Kravitz
U.S.D.J.

Dated at New Haven, Connecticut: January 23, 2004.

29